UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------x

KENNETH WASHINGTON,                          :

      Petitioner,                         :

           -against-                  :

THOMAS GRIFFIN, Superintendent,              :

  Green Haven Correctional Facility,   :

        Respondent.                     :

-----------------------------------------x

## PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

To the Honorable Judge of the United States District Court for the Eastern District of New York:

### PROCEDURAL HISTORY

1.   Petitioner was convicted in the Supreme Court of the State of New York, Queens County.

2.   The date of the judgment of conviction was January 19, 2011.

3.   Petitioner was sentenced under 12 counts of one indictment.  He was not sentenced on more than one indictment in the same court at the same time.

4.   Petitioner is currently incarcerated in the custody of the New York State Department of Corrections and Community Supervision while he serves consecutive and concurrent determinate terms of imprisonment aggregating to 90 years and a 25-year term of

post-release supervision.   His address is DIN 11-A-0902, Green Haven Correctional Facility, P.O. Box 4000, Stormville, New York, 12582-4000.

5.   Petitioner was convicted, after a jury trial, of two counts of burglary in the first degree [N.Y. Penal Law §140.30(2)], one count of burglary in the first degree [N.Y. Penal Law §140.30(3)], three counts of burglary in the second degree [N.Y. Penal Law §140.25(2)], two counts of assault in the first degree [N.Y. Penal Law §120.10(4)], two counts of assault in the second degree [N.Y. Penal Law §120.05(6)], criminal sexual act in the first degree [N.Y. Penal Law §130.50(1)], and sexual abuse in the first degree [N.Y. Penal Law §130.65(1)] (Lasak, J., at trial and sentencing).

6.   The facts of Petitioner's appeal from the judgment are as follows:

(a)  Petitioner appealed his conviction to the Appellate Division of the Supreme Court of the State of New York, Second Department.  Petitioner raised his current claim in his principal and reply briefs in the Appellate Division.

(b)   The Appellate Division affirmed Petitioner's conviction on July 3, 2013.  People v. Washington, 108 A.D.3d 576, 968 N.Y.S.2d 184 (2d Dept. 2013).

(d)  Petitioner sought leave to appeal to the New York State Court of Appeals on that same claim.  Leave to appeal was

2

denied on January 31, 2014.  People v. Washington, 22 N.Y.3d 1091, 981 N.Y.S.2d 677 (2014).

(d)  A copy of the Appellate Division's decision affirming Petitioner's conviction is attached as Exhibit A.  Copies of the Brief for Defendant-Appellant, the Brief for Respondent, and the Reply Brief for Defendant-Appellant in the Appellate Division, Second Department, are attached as Exhibits B, C, and D, respectively.  Copies of Petitioner's application for leave to appeal to the New York State Court of Appeals, the State's opposition letter, and the Order Denying Leave are attached as Exhibit E.

7.  Aside from the direct appeal from the judgment, Petitioner has not filed any actions with respect to that judgment in any state court.

## STATEMENT OF FACTS

Introduction

Petitioner was charged with three separate burglaries for which his identity was established solely by DNA evidence.  On August 17, 2006, Cassandra Whitaker awoke to find someone going through her jewelry box.  That person beat her severely and took jewelry, a MetroCard, and her gun and police shield.  On December 5, 2006, Luisa Gonzalez and her family returned to their home to find that all of her son's video games, several video game systems, a pair of sneakers, and two watches were missing.  On July 17,

2007, Stacey Brown was beaten and sexually assaulted in her home by a man who took jewelry, money, and eyeglasses.

A DNA profile from a cheek swab taken from Petitioner after his arrest for these charges was admitted in evidence, together with the underlying lab reports, as was similar information concerning DNA profiles from evidence found at each crime scene. The only expert witness to testify with regard to DNA testing and profiles admitted that she had not examined or tested the cheek swab and had not done all of the DNA testing on the crime scene evidence. She gave her opinion that DNA profiles from the crime scenes matched Petitioner's cheek swab DNA profile. Defense counsel argued, inter alia, that admission of the DNA report from the cheek swab violated Petitioner's federal constitutional right to confront the witnesses against him, but the court overruled his objection.

The Trial

The Whitaker Burglary

At about 2:00 a.m. on August 17, 2006, New York City Police Detective Cassandra Whitaker awoke to see a man, whose face was covered and who wore a white T-shirt and socks on his hands, searching the jewelry box in her bedroom in her house at 114-31 225th Street in Queens County, New York (478-479, 489, 502-504, 545-547, 569).[1]  She tried to take her loaded gun from the night stand

---

[1]Numbers in parentheses without additional explanation refer
(continued...)

4

drawer without making noise, but he grabbed her hand and, after repeatedly hitting her in the face, took the gun from her, hit her with it, and pushed her into the bathroom.  She was bleeding profusely from her head and forehead and from around her eyes (490-497, 532-539, 568-569).  He left the room, but when she tried to get up, he returned, hit her head with the gun, and stomped on her face.  He turned her pocketbook upside down to empty it and searched her wallet, then left the room and closed the door (496-499, 540-541).  Whitaker had never given Petitioner permission to be in her house (504).

Whitaker, who was taken to the hospital because of her injuries, sustained lacerations and severe bruises, but no cranial bleeding or spinal fractures.  She consulted a plastic surgeon and received stitches to her face and staples to her head.  When she returned home from the hospital a few days later, she found that jewelry, a MetroCard, and her gun and police shield were missing (Whitaker: 505-509; Sandra Torres, M.D.: 576-583).  She did not return to work until about the first of December (510-511).

The Gonzalez Burglary

On December 5, 2006, when Luisa Gonzalez and her family returned to her apartment at 88-49 241st Street in Queens County, New York, they observed signs of an intrusion and noticed that all of her son's video games, several video game systems, a pair of

---

[1](...continued)
to pages of the trial transcript.

sneakers, and two watches had been taken.  They pointed out to the police two gloves that did not belong to them.  Neither Gonzalez nor her son, Luis Alonzo, knew Petitioner (Gonzalez: 677-682, 685, 689-693; Alonzo: 886-891).

The Brown Burglary

On July 15, 2007, Stacy Brown, six months pregnant and a mother of three, was alone in her apartment at 194-54 114th Road. In the early morning hours she was awakened by a "loud thump."  She noticed that some things had been moved but returned to bed (699-708, 754-755).

After the telephone woke her at about 1:00 p.m., a man wearing her white robe and with his face covered by a white towel or T-shirt forced her face down onto her pillow and held her down while he fondled her "butt" and his penis touched the outside of her anus (708-714).  He punched and choked her, demanded money and jewelry, and tied a T-shirt around her face so she could only see downward, but could not see his face (713-716, 766-767).  He wore socks on his hands during part of the incident (735, 762-763).

The man dragged her to the kitchen, where she saw the bottom of the refrigerator door open and heard him gulping, then an iced tea container dropped to the floor (716-718, 767-769, 772).  He brought her to another bedroom and choked her until, about to pass out, she defecated on herself.  Then he threw her in the shower and told her to wash off.  She tried to remove the T-shirt from her head, but he hit her in the face (718-721).  Again he grabbed her,

6

touched his erect penis to the outside of her anus, and choked her until she could not breathe.  She defecated again, and he put her on the toilet (722-727).  After he left the bathroom, she closed and locked the door, opened a window that was 8 feet off the ground, and climbed out head first (728-730, 734).  Brown had never given Petitioner permission to be in the house (751).

Brown suffered bruises and abrasions, but her head, spine, and pelvis were not damaged and there were no "continuing complications" to her health or that of the baby, who was three years old at the time of the trial (Brown: 733-737; Lawrence Kramer, M.D.: 820-828).  She later learned that jewelry, money, and eyeglasses had been taken from the house (736-737).

Evidence Sent for DNA Testing and Matching of DNA Profiles

During daylight hours on the day of the 2:00 a.m. Whitaker burglary, the police recovered a bloody white T-shirt, a bloody white sock, and a black stocking cap near the house.  Whitaker said that those items looked like the ones worn by the burglar (516-517). The shirt was sent for DNA testing (Detective Patrick Curran: 398-407, 453-454; Detective Daniel Boggiano: 619-622, 635).  Also sent for testing were the gloves found in Gonzalez's apartment and the iced tea container from Brown's residence (Detective Shamika Meadows: 640-652; Melvin Shaw: 782-784; Police Officer Yuan Ye: 796-801; Detective William Porter: 845-848).

The parties stipulated that Petitioner was not an identical twin and that had witnesses been called from the New York State

Police Forensic Biology Laboratory in Albany, they would have offered testimony and documentary evidence to establish that DNA profiles developed by the New York City Chief Medical Examiner's Office from a white T-shirt found near Whitaker's residence, a glove found in Gonzalez's apartment, and the iced tea container found in Brown's residence were "uploaded into the New York State DNA Index" and compared to DNA profiles in that index. Petitioner's "DNA profile is on file in that" Index and the three profiles from the crime scene evidence "matched [Petitioner's] DNA profile contained in [that] Index on October 10, 2007." New York State DNA Index personnel "then notified the New York City Police Department" about the matches (894-895).[2] There is no indication in the record that the State was going to present proof that the DNA profile for Petitioner in that database was based on a sample taken from him or, specifically, of who took the sample, when that person took it, who tested the sample, or pursuant to what procedures it had been tested.[3]

Curran and Detective Rich Santangelo received a "notification" regarding DNA from New York State regarding Petitioner. After

---

[2]The court immediately instructed the jury that "there are a variety of ways that an individual's DNA profile may come to be included in the New York State DNA Index. How [Petitioner's] DNA profile came to be included . . . is not a subject of this trial and is irrelevant to the proceedings. You must not speculate about or consider it in any way or consider it in any way . . . " (896).

[3]All of the witnesses on the list of potential witnesses read by the prosecutor to the jury near the start of jury selection testified except for one police officer (John Figueroa) and the father of Stacy Brown, Donovan Brown (25-26, 701).

Santangelo arrested Petitioner on October 11, 2007, Curran took a DNA swab from Petitioner's cheek and sent it for DNA testing (Curran: 424-427; Santangelo: 871-872).

Natalyn Yanoff, an experienced DNA analyst at the Office of the Chief Medical Examiner, was deemed an expert in DNA analysis and forensic biology. She explained that a DNA profile consists of a string of numbers representing specific alleles, two of which may be found at each of up to 15 tested locations, or loci, on a person's DNA, which actually has many more alleles at loci that are not tested. Until 2007, the Chief Medical Examiner's Office tested only 13 loci, and sometimes identification of alleles cannot be made at every loci tested (896-898, 901-906, 926-927, 962-963).

Yanoff prepared DNA profile reports from the evidence from each of the three burglaries and from the swab taken from Petitioner, but admitted that she did not do all of the underlying testing and document preparation on which those reports were based (909-912, 950-952). She did not examine or test Petitioner's cheek swab (950-952). Although she scraped the T-shirt collar for DNA skin cells, she submitted the scrapings to others for testing (922-923), and she never personally examined the glove or iced tea container prior to trial (946-947).

Defense counsel objected to admission of those reports, and to a report comparing the four DNA profiles, asserting that they violated Petitioner's federal and state constitutional rights to confront the witness against him because the expert was testifying

9

about tests performed and reports prepared by others.  The court overruled counsel's objections (912-914, 951-952, 954).

Yanoff testified that the DNA profile from Petitioner's cheek swab matched the profiles from the T-shirt, glove, and iced tea container, so that the DNA from all three objects came from Petitioner (952-954, 957).  However, results could not be obtained for one of the 13 loci from the T-shirt, and for three other loci only one of the two readings were obtained (929-930, 988-994; People's Exhibit 40 at trial)

According to Yanoff, the probability of a particular DNA profile appearing is calculated by multiplying the likelihood of the readings at a particular loci occurring by the likelihood of the readings for all the other loci in the profile occurring (1013-1014).  Yanoff claimed that, based on the 13 loci with two readings in each location, the likelihood of Petitioner's profile appearing in the profiles from each burglary was one in more than one trillion (948-949, 956).  In fact, she was "pretty sure" that results from only 10 loci would create a probability of less than one in a trillion that the particular profile would occur (959-962).  Of course, if the numbers for any single location differed from one sample to another, the profiles would be from different people (958-959).

Prosecutor's Summation

The prosecutor argued that Petitioner's guilt was proved by the DNA evidence, which is "the most reliable form of evidence on

earth today" and "the gold standard in identification evidence" (1078). She contended that the "DNA testing was amazing, competent and certainly not bungled" (1104).

The prosecutor asserted that the DNA evidence proved Petitioner was the perpetrator, pointing to the specific matching numbers contained in the DNA profiles from the crime scenes and the cheek swab. She mentioned the stipulation that the crime scene DNA profiles matched Petitioner's New York State database profile only to state that it brought Petitioner to the attention of the police, who then took his cheek swab and sent it for DNA testing (1100-1101, 1103).

Charge, Deliberations, Verdict, and Sentence

The court submitted to the jury first-degree burglary (two counts), second-degree burglary, first-degree assault, and second-degree assault with regard to Whitaker; second-degree burglary with regard to Gonzalez; and first-degree burglary, second-degree burglary, first-degree assault, second-degree assault, first-degree criminal sexual act, and first-degree sexual abuse with regard to Brown (1123-1141). The jury convicted Petitioner of all counts submitted (1157-1162). The court sentenced Petitioner to consecutive and concurrent determinate sentences aggregating to 90 years in prison with 25 years of post-release supervision (sentencing minutes pp. 17-20).

11

The Appeal to the Appellate Division, Second Department

In his appeal to the Appellate Division, Petitioner argued, inter alia, that the evidence about the DNA profile developed from Petitioner's "cheek swab" (Exhibit B, pp. 36 & 37) was admitted in violation of the Confrontation Clause as interpreted by the Supreme Court in Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527 (2009), and Bullcoming v. New Mexico, __ U.S. __, 131 S.Ct. 2705 (2011), because Yanoff, the only witness to testify on the issue, did not perform the DNA testing herself.[4]  Instead, she testified about the work of other laboratory analysts who created the profiles that Yanoff compared to each other.  Petitioner noted that Williams v. Illinois, which was then pending before the Supreme Court, presented the question of the applicability of the Confrontation Clause to DNA profile testing.  Petitioner admitted that under the case law in the New York courts, the evidence was admissible (Exhibit B, pp. 40-42).

The State contended that the DNA profiles developed from the crime scene evidence were admissible under the recently-issued decision in Williams v. Illinois, __ U.S. __, 132 S.Ct. 2221 (2012), because those profiles "did not have the primary purpose of establishing the guilt of a targeted individual" (Exhibit C, p. 59).  The State did not address the cheek swab evidence or cite Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, or

---

[4]Petitioner specifically referred to the "cheek swab" evidence on pages 40 and 41 of the brief.

Bullcoming v. New Mexico, __ U.S. __, 131 S.Ct. 2705.  The only harmless error argument made by the State was based on trial counsel's stipulation that Petitioner's DNA profile was on file in the New York State database and matched the DNA profiles from the crime scenes (Exhibit C, pp. 60-61).

In a reply brief, Petitioner argued that the admission of evidence about the DNA testing of the cheek swab and the creation of the DNA profile violated the Confrontation Clause as interpreted in these three Supreme Court cases because it was provided by a witness who did not actually test the samples or create either the profile or the report on the testing (Exhibit D, pp. 4-6). Regarding harmless error, Petitioner explained that the stipulation that Petitioner's DNA profile in the New York State database matched the crime scene profiles was apparently agreed upon to explain why the police arrested Petitioner and took his cheek swab. Petitioner further pointed out that the State presented no evidence that the DNA profile listed for Petitioner in that database was developed from a sample actually taken from Petitioner or that the sample was properly tested.  Lastly, Petitioner pointed out that trial counsel would have been grossly negligent had he stipulated that the DNA evidence proved Petitioner was the perpetrator since that was the dominant issue in the trial (Exhibit D, pp. 12-13).

The Appellate Division affirmed Petitioner's conviction.  With regard to admission of the DNA profile from Petitioner's cheek swab, the Appellate Division stated only that the "the DNA profile

13

generated from the swab of the defendant's cheek, standing alone, shed no light on the issue of [Petitioner's] guilt in the absence of the expert's testimony that it matched the profiles derived from the crime scene evidence    (see . . .; see also Williams v. Illinois, __ U.S. __, 132 S.Ct. 2221, 2224 [plurality op])" (citations to New York State case law omitted).    People v. Washington, 108 A.D.3d 576, 577-578 (2d Dept. 2013).    Similarly, the Appellate Division stated, without citing any federal case law, that the crime scene DNA profiles, "standing alone," did not link Petitioner to the crime and, therefore, their admission in evidence did not violate the Confrontation Clause.

Application for Permission to Appeal to the New York State Court of Appeals

In his application for permission to appeal, Petitioner specifically contended that the report on the DNA testing of Petitioner's cheek swab was admitted in violation of his Confrontation Clause rights as developed in Williams v. Illinois, __ U.S. __, 132 S.Ct. 2221, Bullcoming v. New Mexico, __ U.S. __, 131 S.Ct. 2705, and Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527 (Exhibit E).

In response, the State contended that the issue concerning the admission in evidence of the report on the DNA profile developed from Petitioner's cheek swab was not preserved by his attorney's argument at trial that the use of this evidence violated Petitioner's Confrontation Clause rights.    The State did not argue

that the DNA profile testimony about Petitioner's cheek swab was properly admitted (Exhibit E).

Petitioner's application was denied (Exhibit E).

## ARGUMENT

> THE COURT VIOLATED PETITIONER'S RIGHT TO CONFRONT THE WITNESSES AGAINST HIM BY ADMITTING EVIDENCE OF DNA TESTING OF, AND THE DEVELOPMENT OF A DNA PROFILE FROM, THE CHEEK SWAB TAKEN FROM PETITIONER AFTER HE WAS ARRESTED THROUGH A WITNESS WHO LACKED FIRSTHAND KNOWLEDGE OF THE TESTING AND WHO DID NOT DEVELOP THE PROFILE. SEE CRAWFORD v. WASHINGTON, 541 U.S. 36 (2004); U.S. CONST., AMENDS. VI, XIV; N.Y. CONST., ART. 1, §6.

The Confrontation Clause protects a defendant against "testimonial" evidence untested by cross-examination. Crawford v. Washington, 541 U.S. 36 49-55, 68 (2004). In Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527 (2009), and again in Bullcoming v. New Mexico, __ U.S. __, 131 S.Ct. 2705 (2011), the Supreme Court established that reports of testing done in scientific laboratories may be, and was in those cases, testimonial. The four-judge plurality in Williams v. Illinois, __ U.S. __, 132 S.Ct. 2221 (2012), concluded that reports on DNA testing of crime scene evidence were not testimonial because, unlike in Melendez-Diaz and Bullcoming, the reports did not "hav[e] the primary purpose of accusing a targeted individual of engaging in criminal conduct," while the four-judge dissent would have adopted a broader test, whether the testing was performed "to establish . . . some fact in a criminal proceeding." Both groups

of justices clearly would have held that a lab report on a known suspect, such as a report on the DNA test of a cheek swab from a suspect already under arrest for the crime is testimonial. However, the State failed to call as witnesses at Petitioner's trial the laboratory employees who developed the DNA profiles from Petitioner's cheek swab.  Therefore, the State court's affirmance of Petitioner's conviction on his direct appeal was contrary to and an unreasonable application of clearly established Supreme Court law.

In Crawford v. Washington, 541 U.S. at 59, 68, the Supreme Court held that "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine," but left "for another day any effort to spell out a comprehensive definition of 'testimonial.'"   In Davis v. Washington, 547 U.S. 813 (2006), where the Court found one unsworn statement to the police testimonial and another not, the Court explained that statements

> are testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822.

Prior to Williams v. Illinois, 132 S. Ct. 2221, the Supreme Court twice held that reports of forensic testing were testimonial. Melendez-Diaz v. Massachusetts, 557 U.S. 305, 307-308, 329 (2009),

involved laboratory reports that concluded that substances found in plastic bags seized from the defendant's person and from the area where he was sitting in a police car contained cocaine. The Court concluded that those reports were testimonial, quoting Crawford, 541 U.S. 51-52, to the effect that statements "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" were testimonial. 557 U.S. 310. Similarly, in Bullcoming v. New Mexico, __ U.S. __, 131 S.Ct. 2705, 2717 (2011), the Court held a report on a lab test that measured the defendant's blood alcohol concentration was testimonial, noting that it was based on evidence provided to the lab by the police and created "solely for an 'evidentiary purpose'" (citing Melendez-Diaz).

In Melendez-Diaz, the Court explained the importance of the cross-examination requirement as applied to forensic reports, stating that "forensic scientists"

> sometimes face pressure to sacrifice appropriate methodology for the sake of expediency. . . . [They] may feel pressure – or have an incentive – to alter the evidence in a manner favorable to the prosecution. 557 U.S. at 318.

Moreover, "[c]onfrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well." Id. at 319. Similarly, the first paragraph of the dissent in Williams v. Illinois, 132 S.Ct. at 2264, dramatically recounts a case in which a DNA analyst realized after cross-examination that she had confused the victim's DNA samples with those of the defendant, so

17

that the crime scene evidence contained the former's DNA, not the latter's.

Critical to the four-judge Williams plurality was the difference it highlighted between the facts of Williams and those of Melendez-Diaz and Bullcoming, where the forensic reports were testimonial because they were "made for the purpose of proving the guilt of a particular criminal defendant at trial." 132 S.Ct. at 2243. In Williams, the plurality concluded that DNA profile from the crime scene evidence was not testimonial because the "primary purpose" for developing it was "to catch a dangerous rapist" at a time when Williams "had not yet been identified as a suspect." Id. at 2243-2244.[5] The four-judge Williams dissent took a broader view of testimoniality, stating that, consistent with Melendez-Diaz and Bullcoming, a forensic report is testimonial if it "was made to establish . . . some fact in a criminal proceeding" and concluding that the DNA report at issue was testimonial even though a suspect had not yet been identified. Id. at 2266-2268.[6]

―――――――――――――

[5]The Williams plurality also concluded that the report was not testimonial because it was not received in evidence for its truth. The plurality explained that the report was "not introduced into evidence" at all, 132 S.Ct at 2240, but was referred to by the DNA expert as a basis for her conclusions, and in the bench trial held in that case, the judge would have known not to consider the report for its truth. 132 S.Ct at 2236. The plurality admitted that its conclusion would have been different "if Petitioner had elected to have a jury trial." In contrast, in this case, the report was admitted for its truth before a jury. Thus, the plurality's alternative reason for concluding that the report was not testimonial is entirely inapplicable here.

[6]In Williams, the analyst who created the defendant's DNA
(continued...)

Under the analyses of both the plurality and the dissent in Williams, as well as, of course, the majorities in Melendez-Diaz and Bullcoming, the cheek swab report in this case was testimonial because the testing was done after Petitioner was arrested for these crimes and for the specific purpose of proving his guilt of them. Thus, under the analyses of the four plurality justices and the four dissenters, the DNA report based on Petitioner's cheek swab was testimonial. Further, but for his view of the formality aspect of testimoniality that was not shared by any of the other justices, concurring Justice Thomas agreed with the dissent, and under his analysis the same conclusion would result. 132 S.Ct. at 2255. In short, since Petitioner was targeted and under arrest for these crimes when the cheek swab was taken and tested, the resulting DNA reports prepared by persons not called to testify were clearly testimonial under Williams and prior Supreme Court case law and were admitted in violation of Petitioner's Confrontation Clause rights.

These errors cannot be considered harmless. Admission of the DNA profile from Petitioner's cheek swab was essential to the prosecution's case, since the match between that DNA profile and the crime scene DNA profiles was the only proof that Petitioner was the perpetrator. The expert's conclusions that the DNA profiles

---

[6](...continued)
profile testified at the trial and was subject to cross-examination. Therefore, no Confrontation Clause challenge could be raised made to the proof of the defendant's DNA profile. Id. at 2229.

matched were not meaningful unless accompanied by proof that the DNA profiles were properly developed in the labs from the cheek swab and the crime scene evidence.  While Yanoff performed some of these tests personally, others were performed by persons not called to testify.  Thus, the cheek swab DNA profile was essential to the State's case against Petitioner.

The parties' stipulation that the crime scene DNA profiles matched Petitioner's profile in the New York State database did not constitute an admission that the profiles used for the comparisons were properly developed from the evidence.  In order to use the comparison with the New York State database as evidence in chief, the State would have had to prove that the profile listed there for Petitioner had been properly developed from a sample taken from him, but it presented no evidence of who took a sample from Petitioner or when.  Moreover, the list of potential witnesses read to the jury during jury selection included only two witnesses who did not testify - a police officer and Stacy Brown's father.  Thus, it is apparent that the State had no intention of proving that the sample which yielded the DNA profile bearing Petitioner's name in the database was, in fact, taken from Petitioner or that appropriate laboratory procedures were used in creating the profile.  Therefore, the only proven connection between the DNA profiles from the crime scenes and Petitioner was dependent on

evidence of the testing of his cheek swab.[7]  Without this evidence, the State's case would have been insufficient.

Clearly, the stipulation was intended to explain the reason the police arrested Petitioner and took his cheek swab, which was then tested to provide the profile that was the basis for identifying Petitioner. See People v. Ludwig, 24 N.Y.3d 221, 231-232 (2014) ("New York courts have routinely recognized" that testimony about prior statements may be admitted not for their truth but "for the nonhearsay purpose of explaining the investigative process and completing the narrative of events"); People v. Rosario, 100 A.D.3d 660, 661 (2d Dept. 2012) (same); People v. Ragsdale, 68 A.D.3d 897, 897-898 (2d Dept. 2009) (same). That is why, in summation, the only argument the State made based on the cheek swab profile was that the match between it and the crime scene evidence brought Petitioner to the attention of the police.

Petitioner's Entitlement to a Writ of Habeas Corpus

This Court has the power to issue a writ of habeas corpus on Petitioner's Confrontation Clause claim because he exhausted his state remedies, and the Appellate Division's decision affirming his conviction was "contrary to, or involved an unreasonable

---

[7]Moreover, defense counsel would have been grossly ineffective had he stipulated, in effect, that the DNA evidence proved that Petitioner was the perpetrator, in a case where the identity of the perpetrator was the central issue and the DNA evidence was the only proof.

application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

1. Exhaustion

Petitioner, who is currently in state custody, exhausted his state remedies by specifically arguing before the Appellate Division and in his leave application to the Court of Appeals that the laboratory report on the development of a DNA profile from his cheek swab was testimonial, so that admitting it in evidence without calling the laboratory analyst who developed it to testify violated his Confrontation Clause right to cross-examine the analyst. Furthermore, the Appellate Division reached the merits of Petitioner's contention without finding a procedural default. Since the petition has been filed within 1 year and 90 days of the date his state appeal became final, it is timely. Ross v. Artuz, 150 F.3d 97, 98 (2d Cir. 1998).

2. AEDPA Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that a habeas petition "shall not be granted" "unless," inter alia, the State court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. §2254(D)(1). In this case, the State court decision was both "contrary to" and "an unreasonable application of" Supreme Court law.

22

In determining whether a State court decision is "contrary to, or involved an unreasonable application of, clearly established federal law," a court must consider the holdings, but not the dicta, in Supreme Court decisions. White v. Woodall, __ U.S. __, 134 S.Ct. 1697, 1702 (2014); Williams v. Taylor, 529 U.S. at 412. Since "clearly established federal law" "is the governing legal principle or principles set forth by the Supreme Court," Lockyer v. Andrade, 538 U.S. 63, 71-72 (2002), a State court's decision is "contrary to" "clearly established federal law" if, inter alia, it "applies a rule different from the governing law set forth" by the Supreme Court. Bell v. Cone, 535 U.S. 685, 694 (2002). A habeas petitioner may rely on a legal standard stated by the Supreme Court even if that Court denied relief in the case that stated the rule. For example, in Williams v. Taylor, 529 U.S. at 390-391, 394-398, the Court granted habeas relief under the ineffectiveness standard set forth in Strickland v. Washington, 466 U.S. 668, 687-688, 693-695, 698-700 (1984), in which the Court had denied the habeas petition.

The Appellate Division's decision in Petitioner's appeal was "contrary to" "governing law set forth by" the Supreme Court because the State court failed to apply the relevant holdings of the Supreme Court, but used, instead, a standard that had been specifically rejected by that Court. In Melendez-Diaz v. Massachusetts, 557 U.S. at 311, 316-317, and Bullcoming v. New Mexico, 131 S.Ct. at 2714, fn. 6, 2716-2717, the Supreme Court

concluded that forensic laboratory reports made at the request of the police and that the analysts knew "would be available for use at a later trial" were testimonial, so that they could not be admitted in evidence unless the analysts who performed the tests and created the reports testified.   As the DNA tests on Petitioner's cheek swab were performed after the swab was obtained by the police and sent by them to the lab, it was clearly intended to be available for use at People's trial and, thus, was testimonial under the holdings of these two cases.

In Williams v. Illinois, the Supreme Court applied these Confrontation Clause principles to DNA testing.   The four-judge plurality concluded that the DNA report on crime scene evidence was not testimonial because it "was not prepared for the primary purpose of accusing a targeted individual" or "to obtain evidence for use against [the defendant], who was neither in custody nor under suspicion at that time."   132 S.Ct. at 2243.   The four-judge dissent employed the broader definition of testimonial developed in Melendez-Diaz and Bullcoming that would include cases involving targeted individuals (a position with which the plurality agreed) and other cases as well.   132 S.Ct. at 2273-2274.

The plurality's decision stated the holding of the Court as relevant to DNA testing of a suspect already under arrest.   See Marks v. United States, 430 U.S. 188, 193 (1977) ("the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds") (citing Gregg

24

v. Georgia, 428 U.S. 153, 169, n. 15 (1976)).[8] Because Petitioner was a "targeted individual," having been arrested for the crimes of which he was convicted before the cheek swab was taken and tested, the Appellate Division's conclusion that the report was not testimonial is clearly "contrary to" Supreme Court law as stated in Melendez-Diaz, Bullcoming, and both the plurality and the four-judge dissent in Williams.

Moreover, the Appellate Division's justification for its decision that the cheek swab was not testimonial makes clear that its decision was "contrary to . . . clearly established federal law." The Appellate Division explained that it rejected Petitioner's contention because the cheek swab DNA profile "shed no light on the issue of the defendant's guilt in the absence of the expert's testimony that it matched the profiles derived from the scene evidence." People v. Washington, 108 A.D.3d 576, 577 (2d Dept. 2013). However, the Supreme Court's rule requires a court to consider only whether the challenged evidence was prepared for an "evidentiary purpose" to be used later at a trial, without reference to the existence of other evidence.[9] To the contrary, in

_____

[8]In United States v. James, 712 F.3d 79, 94-96 (2d Cir. 2013), the Second Circuit concluded that as applied to laboratory testing performed before a particular suspect is identified (such as DNA testing performed on crime scene evidence when the identity of the perpetrator is unknown) the three opinions in Williams did not result in any clear holding. That court "confined [Williams] to the particular set of facts presented in that case" and applied prior Supreme Court precedent from Melendez-Diaz and Bullcoming.

[9]The Appellate Division cited state case law as authority for
(continued...)

Melendez-Diaz, 557 U.S. at 313-314, the Supreme Court directly rejected the claim that analysts who perform forensic testing are not subject to the Confrontation Clause because "their testimony is inculpatory only when taken together with other evidence." Therefore, the Appellate Division clearly employed an incorrect legal standard in concluding that the cheek swab DNA report was not testimonial and that Petitioner's conviction should be affirmed.

Indeed, there was no pretense in the direct appeal that the cheek swab DNA profile was not testimonial. In its brief in the Appellate Division and its letter opposing Petitioner's request for permission to appeal to the New York Court of Appeals, the State never argued that under the Supreme Court's, or any other court's, case law, forensic reports on a suspect already under arrest are not testimonial. See Williams v. Taylor, 529 U.S. at 395 (noting that the State "barely disputed" the trial court's finding of ineffectiveness with which the Supreme Court agreed).

The Appellate Division's affirmance of Petitioner's conviction was also an "unreasonable application" of Supreme Court precedent. A state court makes an unreasonable application of federal law when it "'correctly identifies the correct governing legal principle

_____

[9](...continued)
its conclusion, then added "see also Williams v. Illinois" at 132 S.Ct. 2224. However, page 2224 of Williams contains part of the Syllabus, not of the opinion itself. Moreover, that page of the Syllabus contains a summary of the section of the opinion concerning the use by the expert of the DNA profile report as a basis for her opinion without having the report admitted in evidence. Therefore, neither that portion nor any other part of the plurality's opinion supports the Appellate Division's decision.

from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 413.   That the state court decision was incorrect does not alone satisfy this standard, as the decision must also be "objectively unreasonable," <u>Id.</u> at 409-411, and "beyond any possibility for fairminded disagreement." <u>White</u> v. <u>Woodall</u>, 134 S.Ct. at 1702.  The issue is not, however, whether all reasonable jurists would agree that there was error, <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 409, but whether there was "some increment of incorrectness beyond" mere error, which "need not be great." <u>Francis S.</u> v. <u>Stone</u>, 221 F.3d 100, 111 (2d Cir. 2000).  <u>Accord</u>, <u>Jimenez</u> v. <u>Walker</u>, 458 F.3d 130, 147 (2d Cir. 2006); <u>Howard</u> v. <u>Walker</u>, 406 F.3d 114, 122 (2d Cir. 2005).

Here, the State court's affirmance of Petitioner's conviction was unreasonable.  <u>Melendez-Diaz</u> and <u>Bullcoming</u> broadly concluded that laboratory reports were testimonial, and while <u>Williams</u> arguably limited the rule to reports on targeted individuals, Petitioner indisputably was targeted at the time the swab was taken from his cheek and a DNA profile was created.  Thus, Supreme Court case law required the conclusion that the reports on the DNA profile from the cheek swab were testimonial, and any contrary conclusion was "objectively unreasonable."

While the Appellate Division correctly cited <u>Williams</u> v. <u>Illinois</u> as a relevant statement of Supreme Court law, it incorrectly applied <u>Williams</u> to this case.  Indeed, the legal

principle the Appellate Division drew from <u>Williams</u>, that the cheek swab DNA profile was not testimonial because, "standing alone [it] shed no light on the issue of [Petitioner's] guilt," was an incorrect statement of the holding in <u>Williams</u> and the other relevant Confrontation Clause cases decided by the Supreme Court. Therefore, at the time of the appeal, "clearly established Federal law, as determined by the Supreme Court of the United States" permitted only the conclusion that the DNA report on the cheek swab was testimonial.  As any other conclusion was unreasonable, the Appellate Division unreasonably applied <u>Williams</u>, <u>Melendez-Diaz</u>, and <u>Bullcoming</u> to this case.

<u>CONCLUSION</u>

FOR THE REASONS ADVANCED ABOVE, THE PETITION FOR A WRIT OF HABEAS CORPUS SHOULD BE GRANTED.

Respectfully submitted,

LYNN W.F. FAHEY
Attorney for Kenneth Washington

By: Jonathan M Kratter

DATED: New York, New York
       February 2015