UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------x
KENNETH WASHINGTON,

        Petitioner,

  -against-                          **MEMORANDUM AND ORDER**
                                                    15-CV-603 (FB)
THOMAS GRIFFIN, Superintendent,
Green Haven Correctional Facility,

        Respondent.
---------------------------------------------------x

*Appearances:*
*For the Petitioner:*                           *For the Respondent*
JONATHAN M. KRATTER              RICHARD A. BROWN
Appellate Advocates                     JOHN M. CASTELLANO
2 Rector Street                               JOHNNETTE TRAILL
New York, NY 10006                   WILLIAM H. BRANIGAN
                                                      Queens County District Attorney's
                                                      Office
                                                      125-01 Queens Boulevard
                                                      Kew Gardens, New York 11415

**BLOCK, Senior District Judge:**

      Kenneth Washington ("Washington"), currently serving a ninety-year sentence, petitions the court for a writ of habeas corpus. Washington asserts that the admission of a DNA profile during his trial violated his Sixth Amendment right to confrontation because he was not afforded the opportunity to cross-examine the lab technicians who generated it. For the following reasons, Washington's petition is denied.

**I**

      On August 17, 2006, Cassandra Whitaker ("Whitaker") awoke to see a man

searching through her jewelry box. The man wore a white t-shirt, his face was covered, and he had socks on his hands. Whitaker reached for her loaded gun in her nightstand drawer, but the intruder grabbed her hand, took the gun, and repeatedly hit her in the face, causing her to bleed. After searching the contents of Whitaker's pocketbook and wallet, the man left the room. The police recovered a bloody white t-shirt near Whitaker's house, which was sent to the Office of Chief Medical Examiner ("OCME") for DNA analysis.

On December 5, 2006, Luisa Gonzalez ("Gonzalez") and her family returned to her apartment to find it had been burglarized. They identified for the police two gloves they found in the apartment that did not belong to them. The gloves were sent to OCME for DNA analysis.

On July 15, 2007, Stacy Brown ("Brown") awoke to find a man in her apartment wearing her white robe, with his face covered by a white shirt or towel. He forced her head down on the pillow, fondled her buttocks, and touched his penis to the outside of her anus. The man then beat Brown, demanded money and jewelry, and dragged her into the kitchen. Brown saw the bottom of the refrigerator door open, and could hear the man drinking; she then saw a container of iced tea drop to the floor. The intruder dragged Brown into the bathroom, continued to beat her, and then left the room. Brown locked the bathroom door and escaped through the window headfirst. As part of the subsequent police investigation, the iced-tea container was sent to OCME for DNA analysis.

OCME generated DNA profiles from human cells gathered from the evidence sent to it for analysis. A DNA profile is a string of numbers that represent the presence of specific variations in an individual's DNA sequence. *See* Tr. Trans. at 905.

It was determined that the DNA profile generated from the bloody white t-shirt, the gloves, and the iced-tea container each matched Washington's DNA profile on the New York State DNA Databank. He was arrested the next day. A police officer took a swab of Washington's cheek and sent it to OCME for DNA analysis. With respect to all three incidents, Washington was charged with numerous counts of burglary, assault, criminal sexual act, and sexual abuse.

During Washington's trial in New York State Supreme Court, Queens County, the State called Natalyn Yanoff, a DNA analyst from OCME, as an expert witness in DNA analysis and forensic biology. Although Yanoff did not personally conduct the laboratory testing to generate the DNA profiles, she prepared reports comparing the profiles derived from cells found on the bloody white shirt, the gloves, the iced-tea container, and Washington's cheek. She testified that each DNA profile matched. Yanoff further testified that the probability of this DNA profile appearing in a specific individual was one in greater than one trillion.

Washington objected to the admission of Yanoff's reports and testimony because it relied on the DNA profiles generated by testing that Yanoff did not personally perform.

3

The trial court overruled the objection, and the jury convicted Washington on all counts. Washington was sentenced to serve ninety years in prison.

On appeal to the Second Department, Washington argued, among other things, that his Sixth Amendment right to confrontation was violated because he was not afforded the opportunity to cross-examine the lab technician that generated the DNA profile from his cheek swab. The Second Department rejected Washington's contention because "the DNA profile generated from the swab of the defendant's cheek, standing alone, shed no light on the issue of the defendant's guilt in the absence of the expert's testimony that it matched the profiles derived from the crime scene evidence." *People v. Washington*, 968 N.Y.S.2d 184, 187 (2d Dep't 2013) (citing, among others, *Williams v. Illinois*, 132 S. Ct. 2221, 2224 (2012) (plurality opinion)). The Court of Appeals denied leave to appeal. *See People v. Washington*, 22 N.Y.3d 1091 (2014).

Washington now petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the sole ground that the admission of the DNA profile generated from his cheek swab without an opportunity to cross-examine the lab technician that conducted the testing denied him his Sixth Amendment right of confrontation.

## II

Washington's Confrontation Clause claim was adjudicated on the merits in state court. Accordingly, this Court may grant his petition only if the state court's adjudication of the claim "was contrary to, or involved an unreasonable application of, clearly

4

established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This is a very difficult standard to meet. Washington must show that the state court's ruling on his Confrontation Clause claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

### III

**A. The Confrontation Clause**

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. CONST. amend VI. For years, a defendant's confrontation right was determined by whether the challenged evidence fell "within a firmly rooted hearsay exception." *Ohio v. Roberts*, 448 U.S. 56, 66 (1980). However, in *Crawford v. Washington*, the Supreme Court altered the legal landscape by holding that "testimonial" out-of-court statements may not be admitted without confrontation. 541 U.S. 36, 68 (2004) ("Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."). The Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Id.*

The Court began to shape the bounds of the meaning of "testimonial" in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). In *Melendez-Diaz*, the defendant was charged with distributing and trafficking cocaine. *Id.* at 308. The trial court admitted "certificates

5

of analysis" that stated the forensic results of testing performed on substances seized by the police. *Id.* The certificates, sworn to before a notary public by the laboratory analysts, affirmed the substances were cocaine. *Id.* The Supreme Court held that the certificates were testimonial and thus inadmissible unless the defendant was afforded an opportunity to cross-examine the laboratory analysts. *Id.* at 311. The Court explained that "[t]he documents at issue here, while denominated by Massachusetts law 'certificates,' are quite plainly affidavits: 'declaration[s] of facts written down and sworn to by the declarant before an officer authorized to administer oaths.'" *Id.* at 310 (second alteration in original) (quoting BLACK'S LAW DICTIONARY 62 (8th ed. 2004)).

Subsequently, in *Bullcoming v. New Mexico*, a defendant charged with driving while intoxicated challenged the admission of a forensic laboratory report regarding the alcohol content in his blood. 131 S. Ct. 2705, 2710 (2011). The analyst also certified in the report the steps he engaged in to conduct the forensic testing. *Id.* at 2714. Despite not being sworn to before a notary, the Supreme Court noted why the report was sufficiently "formal" to be considered testimonial:

> Here, as in *Melendez-Diaz*, a law-enforcement officer provided seized evidence to a state laboratory required by law to assist in police investigations. Like the analysts in *Melendez-Diaz*, [the analyst] tested the evidence and prepared a certificate concerning the result of his analysis. Like the *Melendez-Diaz* certificates, [the analyst's] certificate is "formalized" in a single document, headed a "report." Noteworthy as well, the [report] form contains a legend referring to municipal and magistrate courts' rules that provide for the admission of certified blood-alcohol analyses. *Id.* at 2717 (citations omitted).

6

Because "the formalities attending the 'report of blood alcohol analysis' [were] more than adequate to qualify [the analyst's] assertions as testimonial," *id.* at 2717, the report was inadmissible unless the defendant had an opportunity to cross-examine the analyst who prepared it.

Most recently, however, in *Williams v. Illinois*, a highly fractured Supreme Court held that a defendant's right to confrontation was not violated when the prosecution's expert witness's testimony relied on a DNA profile that the expert did not personally prepare. 132 S. Ct. 2221, 2227, 2244 (2012) (plurality opinion). Writing for a four-justice plurality, Justice Alito opined that the confrontation clause was not triggered because (1) the DNA profile was an out-of-court statement that was not offered "to prove the truth of the matter asserted," and (2) the primary purpose of the DNA report "was not to accuse petitioner or to create evidence for use at trial." *Id.* at 2228, 2243 (plurality opinion). These two rationales were explicitly rejected by five justices, thus "in all except its disposition, [Justice Alito's] opinion is a dissent." *Id.* at 2265 (Kagan, J. dissenting).

Justice Thomas, concurring alone, provided a fifth vote for allowing the admission of the DNA profile because the DNA report "lacked the requisite 'formality and solemnity' to be considered '"testimonial"' for purposes of the Confrontation Clause." *Id.* at 2255 (Thomas, J. concurring) (quoting *Michigan v. Bryant*, 131 S. Ct. 1143, 1167 (2011) (Thomas, J. concurring)). Justice Thomas distinguished the testimonial certificates in *Melendez-Diaz* and *Bullcoming* by noting that the DNA profile was not sworn to before a

7

notary, did not contain a "Certificate of Analyst" signed by the scientist who performed the testing, nor an affirmation regarding the procedures used when creating the DNA profile. *Id.* (Thomas, J. concurring).

Lastly, writing for four dissenting justices, Justice Kagan would have held that under *Melendez-Diaz* and *Bullcoming*, the defendant had a Sixth Amendment right to cross-examine the technician that prepared the DNA profile. *Id.* at 2277 (Kagan, J. dissenting).

## B. Washington's Habeas Corpus Petition

As noted above, to obtain habeas corpus relief Washington must show that the state court's judgment was an unreasonable application of "clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). After *Williams*, however, the Supreme Court's Confrontation Clause jurisprudence is hardly a model of clarity. To the extent the Supreme Court announced a clear rule in *Melendez-Diaz* and *Bullcoming*, "that clear rule is clear no longer." *Williams*, 132 S. Ct. at 2277 (Kagan, J. dissenting). As Justice Kagan explained dissenting in *Williams*:

> The five Justices who control the outcome of today's case agree on very little. Among them, though, they can boast of two accomplishments. First, they have approved the introduction of testimony at Williams's trial that the Confrontation Clause, rightly understood, clearly prohibits. Second, they have left significant confusion in their wake. What comes out of four Justices' desire to limit *Melendez-Diaz* and *Bullcoming* in whatever way possible, combined with one Justice's one-justice view of those holdings, is—to be frank—who knows what. Those decisions apparently no longer mean all that they say. Yet no one can tell in what way or to what extent they are altered because no proposed limitation commands the support of a majority. *Id.* (Kagan, J. dissenting).

8

The Second Circuit has opined that the fractured nature of *Williams* confines it to its facts such that *Melendez-Diaz* and *Bullcoming* remain controlling. *United States v. James*, 712 F.3d 79, 95 (2d Cir. 2013) ("*Williams* does not, as far as we can determine . . . yield a single, useful holding relevant to the case before us.  It is therefore for our purposes confined to the particular set of facts presented in that case."); *see also Williams*, 132 S. Ct. at 2277 (Kagan, J. dissenting) ("[U]ntil a majority of this Court reverses or confines those decisions, I would understand them as continuing to govern, in every particular, the admission of forensic evidence.").  But even confining *Williams* to its facts does not clarify the law applicable to Washington's claim because he challenges the admissibility of a DNA profile, the same type of evidence at issue in *Williams*.  Moreover, the Second Circuit in *James* was not constrained—as the Court is here—by § 2254; it owed no deference to a state court decision, nor was it limited to applying "clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254; *see generally James*, 712 F.3d at 87 (addressing the issues before the court on direct appeal).

Washington attempts to distinguish *Williams* by arguing that the plurality opinion would rule differently in his case because he was in custody when the DNA profile in question was generated.  Indeed, the *Williams* plurality explained that the confrontation clause was not implicated in that case because the "primary purpose" of generating the DNA profile "was not to accuse petitioner or to create evidence for use at trial" when the petitioner "was neither in custody nor under suspicion" at the time the profile was

9

generated. *Id.* at 2243 (plurality opinion). Here, however, Washington was under arrest when the DNA profile was generated from his cheek swab. He asserts that because he was a "targeted individual[]," the *Williams* plurality would clearly find the profile to be inadmissible under the Confrontation Clause. Pet. at 27.

But whether the defendant was in custody was not the plurality's only consideration for determining the primary purpose of the DNA profile; it also considered that "[w]hen lab technicians are asked to work on the production of a DNA profile, they often have no idea what the consequences of their work will be. . . . The technicians who prepare a DNA profile generally have no way of knowing whether it will turn out to be incriminating or exonerating—or both." *Williams*, 132 S. Ct. at 2244 (plurality opinion). And "in many labs, numerous technicians work on each DNA profile," such that "[w]hen the work of a lab is divided up in such a way, it is likely that the sole purpose of each technician is simply to perform his or her task in accordance with accepted procedures." *Id.* (plurality opinion). Here, Yanoff testified that in the laboratory that generated Washington's DNA profile, multiple analysts perform each test much like an "assembly line making a car." Tr. Trans. 910. Moreover, the plurality explained that a DNA profile is "not inherently inculpatory. On the contrary, a DNA profile is evidence that tends to exculpate all but one of the more than 7 billion people in the world today." *Williams*, 132 S. Ct. at 2228 (plurality opinion). In that vein, the Second Department specifically noted that "the DNA profile generated from the swab of the defendant's cheek, standing alone, shed no light on the issue of the

10

defendant's guilt in the absence of the expert's testimony that it matched the profiles derived from the crime scene evidence." *Washington*, 968 N.Y.S.2d at 187 (citing, among others, *Williams*, 132 S. Ct. at 2224 (plurality opinion)). Accordingly, whether the plurality would hold that the primary purpose of those preparing Washington's DNA profile implicated the Confrontation Clause is, at the very least, debatable. *See Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013) ("It is settled that a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.'" (quoting *Harrington*, 562 U.S. at 102)).[1]

Finally, the DNA profile prepared in this case was no more "formal" or "solemn" than the report in *Williams* such that the Court has any indication Justice Thomas would join the four *Williams* dissenters in voting to find a right to confrontation. Like the evidence at issue in *Williams*, Washington's DNA profile "is neither a sworn nor a certified

---

[1]At oral argument, Washington's counsel raised the argument that the *Williams* plurality would hold differently in this case because Williams was convicted in a bench trial while Washington was tried before a jury. To be sure, the plurality emphasized the importance of such a distinction when holding that the DNA profiles were admissible because they were not admitted for their truth. *Williams* 132 S. Ct. at 2234-35 (plurality opinion) ("When the judge sits as the trier of fact, it is presumed that the judge will understand the limited reason for the disclosure of the underlying inadmissible information and will not rely on that information for any improper purpose."). But the plurality determined that "[e]ven if the Cellmark report had been introduced for its truth, [it] would nevertheless conclude that there was no Confrontation Clause violation" under an independent rationale because the DNA profile was not "prepared for the primary purpose of accusing a targeted individual." *Id.* at 2242, 2243 (plurality opinion).

11

declaration of fact;" "[n]owhere does the report attest that its statements accurately reflect the DNA testing processes used or the results obtained;" although the report was "approved," the approving individual "neither purport[s] to have performed the DNA testing nor certif[ies] the accuracy of those who did;" and "although the report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation." *Williams*, 132 S. Ct. at 2260 (Thomas, J. concurring).[2]

Considering the lack of clarity in the Supreme Court's Confrontation Clause jurisprudence, and in light of the factual similarities between *Williams* and the present case, this Court cannot hold that the state court's judgment—which mirrored the disposition in *Williams*—was an unreasonable application of clearly established Supreme Court precedent.

## IV

For the foregoing reasons, Washington's petition is DENIED. However, because Washington has made a substantial showing of the denial of a constitutional right, a certificate of appealability will issue. *See* 28 U.S.C. § 2253. The issue certified for appeal is whether the Second Department's decision denying Washington's Confrontation Clause

---

[2] That the admitted copy of the report bore OCME's seal certifying the exhibit was "a true and accurate copy" does not bear on the formality or solemnity of the exhibit itself. The seal certified only the accuracy of the copy of the report as it relates to the original; it in no way attested to the accuracy of the information contained in the exhibit.

12

claim was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court.

    **SO ORDERED.**

/S/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
November 4, 2015