1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

|  |  |
|---|---|
| KENNETH WASHINGTON, | : 15-CV-00603 (FB) |
| Plaintiff, | : |
| -against- | : United States Courthouse<br>: Brooklyn, New York |
| THOMAS GRIFFIN, | : Wednesday, October 28, 2015<br>: 4:00 p.m. |
| Defendant. | : |

- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Plaintiff:   APPELLATE ADVOCATES
                     111 John Street, 9th Floor
                     New York, New York 10038
                BY:  PAUL SKIP LAISURE, ESQ.

For the Defendant:   QUEENS COUNTY DISTRICT ATTORNEY'S OFFICE
                     125-01 Queens Boulevard
                     Kew Gardens, New York 11415
                BY:  WILLIAM H. BRANIGAN, ESQ.
                     Assistant District Attorney

Court Reporter:      SHERRY J. BRYANT, RMR, CRR
                     225 Cadman Plaza East
                     Brooklyn, New York 11201
                     **sbryant102@verizon.net**

Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.

PROCEEDINGS                                                    2

1              (In open court.)
2              COURTROOM DEPUTY:  Civil cause for oral argument,
3     Washington versus Griffin.  I ask counsel if you could state
4     your appearances.  You may be seated.
5              MR. LAISURE:  Good afternoon, Judge.  Paul Skip
6     Laisure, L-a-i-s-u-r-e, with Appellate Advocates for Mr.
7     Washington.
8              MR. BRANIGAN:  Good afternoon, Your Honor.  William
9     Branigan, B-r-a-n-i-g-a-n, from the Queens District Attorney
10    for the respondent.
11             THE COURT:  All right.  And this lady in the back of
12    the courtroom, are you here on this matter?
13             MS. ZLOCZOWER:  I'm just observing, Your Honor.
14             MR. LAISURE:  A colleague of mine observing.
15             THE COURT:  Why don't you come up here.  You look
16    like you're isolated back there.  There's no need to do that.
17    Have you been working on this matter with Mr. Laisure?
18             MS. ZLOCZOWER:  I work in the same office as Mr.
19    Laisure, but not on this matter.
20             THE COURT:  Just sit down and you'll probably be
21    able to hear us better when you're close by.
22             MS. ZLOCZOWER:  Thank you.
23             THE COURT:  So we have this interesting
24    confrontation issue.  You folks have done a wonderful job
25    briefing it and paying attention to it.  It's a textbook law

1  school type of problem, right? But we're going to just ask
2  you folks a few questions, and it's silly for me just to have
3  you make speeches because I don't think it makes for effective
4  argument in a matter like this, right?
5           So I'm just curious, in terms of seeing whether
6  we've covered our research properly, are there any Circuit
7  Court decisions that have directly dealt with the Washington
8  dynamic which have come out and said that being in custody is
9  the raison d'etre of the principal factor that we have to
10 consider in order to decide whether the Confrontation Clause
11 is implicated or not?
12          I wonder whether we have anything in addition to
13 Williams to discuss and what the Circuits have said about a
14 Washington case if it was presented like we have it here, not
15 on habeas review but on direct appeal.
16          Does anybody else out there, anybody, know any other
17 cases like this?
18          MR. BRANIGAN: Your Honor, honestly, I don't have
19 anything for you. At the time I -- at the time I did my
20 research there was nothing on point, but I know that a number
21 of federal courts have been looking at the issue. But I
22 didn't have anything that squared.
23          THE COURT: We're looking into it. I just want to
24 give the current overview, so to speak.
25          Mr. Laisure, do you have any Circuit Court

1  authority?
2          MR. LAISURE:  I looked through the Second Circuit
3  cases over the last several years since we originally filed
4  this and found nothing.  I found only a few district court
5  decisions that weren't necessarily on point.
6          THE COURT:  So I just wanted to start by just sort
7  of getting current on our research.  Obviously, I have a
8  wonderful law clerk and we want to make sure that whatever we
9  write does have the latest research in it.
10         So I'll ask you, Mr. Branigan, that if this were not
11 a habeas case and it was here on direct litigation, so to
12 speak, and not on habeas review -- the habeas thing adds some
13 complexities to it, obviously.
14         MR. BRANIGAN:  Right.
15         THE COURT:  Do you think the case would be decided
16 differently?
17         MR. BRANIGAN:  No, Your Honor.
18         THE COURT:  Why not?
19         MR. BRANIGAN:  Because there's never been a
20 five-judge majority of the Supreme Court that excluded this
21 type of evidence, meaning the Melendez-Diaz and Bullcoming.
22 In both of those cases, you both had sworn-to documents that
23 were admitted solely for the primary purpose of proving a
24 particular fact.  In this case, the documents are not sworn
25 to; there's a four-judge plurality.

PROCEEDINGS 5

1    THE COURT: We're going to talk about Williams. But
2 it seems that the issue -- here the person is in custody at
3 the time that the DNA evidence was obtained, right?
4    MR. BRANIGAN: Correct.
5    THE COURT: And in Williams, that seemed to be a
6 significant consideration by the plurality, so to speak, in
7 Williams, the in custody or not in custody dynamic, right?
8    So you have a situation when somebody's in custody,
9 this would not be on habeas review but on just direct appeal.
10 You say it would not make any difference either way. You
11 can't say that the results would be different than what
12 Williams instructs.
13    MR. BRANIGAN: That is correct. That is this
14 four-judge plurality hasn't analyzed it. And I'd suggest,
15 Your Honor, that these same four judges would have come
16 down -- even if we change the circumstances up more, they
17 would have on come down as they did.
18    THE COURT: Which four judges are you talking about?
19    MR. BRANIGAN: The four judges in the plurality on
20 this case. And if you look right at the top of their
21 decisions, they talk about how this type of scientific
22 evidence has been admitted for the last 200 years. When they
23 talk about primary purpose, they also discuss how the
24 scientists actually work in a case like this, meaning you have
25 an assembly line, each person doing their own discrete task,

SHERRY BRYANT, RMR, CRR

1  so nobody actually accusing the -- or offering testimony in
2  the sense of the Confrontation Clause.
3          THE COURT: So then I have your take on that.
4          Mr. Laisure, let me just focus on the fact that it
5  doesn't appear to me that the issue of custody is the sine qua
6  non of Alito's decision unless I'm reading it wrong, that he
7  talks, as Mr. Branigan has just suggested, about a range of
8  other factors that are in play here certainly apart from the
9  custody issue.
10         And your position is that that's not the sine qua
11 non.
12         MR. BRANIGAN: Correct, Your Honor.
13         THE COURT: So you have to address that.
14         MR. LAISURE: We're talking about Williams, right,
15 Judge?
16         THE COURT: Yes.
17         MR. LAISURE: My reading of Williams is there were
18 two reasons that the four-judge plurality decided that there
19 was no Confrontation Clause problem. One was the custody
20 issue, that there was no target. The other was that it was
21 not introduced into evidence.
22         My position is neither of those things are present
23 in our case. In our case, the evidence was introduced into
24 evidence before the jury without a limiting instruction and
25 the testing was done before a target. And when you add those

1   facts together and you go to the dissent, and the dissent said
2   that, you know, they thought that even -- that the majority
3   opinion denying it was incorrect and that it should have been
4   considered a Confrontation Clause, and you look at the dicta
5   of the majority, Alito said:  Absent an evaluation of the risk
6   of juror confusion, which was not done in our case, and
7   careful jury instructions, which were not given in our case,
8   the testimony could not have been brought before the jury.
9           So the four dissenters would have agreed that there
10  was a Confrontation Clause violation and the four plurality
11  would also have agreed on our facts.
12          THE COURT:  Well, that's the problem, whether that's
13  really correct.  Certainly the four dissenters, we know that.
14  We're not talking about Thomas, we know how Justice Thomas
15  would decide the case, right?  We're talking about Alito's
16  decision.
17          He seems to talk about other considerations, and I'm
18  quoting from the plurality opinion.  "When lab technicians are
19  asked to work on the production of a DNA profile, they often
20  have no idea what the consequences of their work will be.  The
21  technicians who prepare a DNA profile generally have no way of
22  knowing whether it will turn out to be incriminating or
23  exonerating or both."  That's the plurality opinion at page
24  2244.  It goes on to say:  "And in many labs numerous
25  technicians work on each DNA profile, such that when the work

of a lab is divided up in such a way it is likely that the sole purpose of each technician is simply to perform his or her task in accordance with accepted procedures."

So it seems that these are factors that really are not dependent upon whether something was offered in evidence or not or whether somebody was in custody or not. So I lifted that out of Williams, the plurality opinion.

MR. LAISURE: Well, I disagree with that.

THE COURT: You don't disagree with whether I'm quoting it correctly?

MR. LAISURE: No, I don't disagree with the quote, but I disagree with the conclusion, because Melendez-Diaz and Bullcoming, which are both forensic evidence cases, talk about the fact that you need to have the right to challenge the competency of what is being done by the lab technicians, and that once someone is targeted then the correct way of challenging that is confrontation, is cross-examination.

THE COURT: So Justice Kagan says that one thing is most cases which we thought have clearly set forth the law don't seem to be so clear anymore; right? So she seems to suggest that this is really not so clear. So that gets us into the habeas dynamic as well, because we have to apply clearly established Supreme Court law, and Kagan says it's not clearly established. What do I do with that?

MR. LAISURE: I don't think that that's really what

PROCEEDINGS                                                9

1   she was saying.  The problem is that when you look at the
2   Williams statement that it shouldn't have come in and you have
3   a five-judge majority saying that forensic evidence requires
4   cross-examination when you have a targeted individual, the
5   fact that it's DNA versus blood alcohol content versus cocaine
6   testing becomes a difference that it's irrelevant what kind of
7   forensic testing is involved.
8           So when you take the facts of Williams and turn them
9   on their head and say the DNA was a targeted individual, which
10  is our case, and was put directly into evidence, how is it
11  different from Bullcoming and Melendez?  I don't think it is.
12          THE COURT:  Well, I think Mr. Branigan is going to
13  tell you why it is right now, or he's going to try to do that.
14          MR. BRANIGAN:  Well, it's -- first of all, Your
15  Honor, the real difference here is that there is no sworn-to
16  document, meaning that there is no -- there is a sworn-to
17  document, but that --
18          THE COURT:  It was put into evidence.  He was in
19  custody and this was relied upon as evidentiary material.
20          MR. BRANIGAN:  It still wasn't a sworn-to
21  conclusion, and that's all that Justice Thomas has said that
22  he'll exclude.  So that's why there's a different result in
23  this case.
24          Secondly, as far as the ultimate conclusion in this
25  case, comparing it to Bullcoming and to Melendez-Diaz, the

1  testifying analyst is relying on a series of machine-generated
2  graphs.  She's looking at the graphs and coming to a
3  conclusion on the stand.
4           In Bullcoming, the sworn-to document by the
5  nontestifying analyst was a certification in which he put the
6  number on and he put some other information on, and that was
7  introduced into the evidence to prove the main fact at issue
8  in trial.  So this is --
9           THE COURT:  I interrupt all the time.  I used to say
10 I don't mean to interrupt and I always believed I did mean to
11 interrupt, so I don't say that anymore.
12          But a jury doesn't know the difference about
13 something being sworn to; they know what's in evidence and
14 what's not in evidence.  Really, isn't that the heart of the
15 Confrontation Clause dynamic?
16          MR. BRANIGAN:  Ultimately, the -- well, there's
17 differing opinion on what the heart of the dynamic is.  And
18 what the plurality would say in this particular case is that
19 an analyst is always entitled to rely on foundational
20 information.
21          And here, the foundational information is what's
22 contained in those documents.  The jurors looking at that
23 couldn't possibly make any sense out of it.  The graphs
24 contain -- the information contained only can provide a
25 foundation to the testifying analyst to make her ultimate

1 conclusion that the DNA, the DNA matched the defendant's DNA.
2 THE COURT: All right. So now for habeas purposes,
3 if I were deciding this case in the first instance I might
4 say, well, I interpret the Supreme Court decision to be as you
5 suggest I should; but now we have the added wrinkle of habeas,
6 which says that no reasonable jurist can disagree, that very,
7 very high standard.
8 I guess conceptually, there's such a case which is
9 one which we could decide differently on direct review as
10 compared to the dynamics of the habeas review. It's that
11 extra wrinkle that really lose a lot of habeas cases.
12 How do I get around the habeas standard here?
13 MR. LAISURE: I think Mr. Branigan hasn't shown how
14 this case is different from Bullcoming and Melendez, and
15 that's how. If this case is the same as those cases, then
16 there's clearly established law.
17 And my position is this case is so different from
18 Williams and the main reasons that Williams was decided that
19 this case instead comes under the very general and plausible
20 rubric of those other two cases, which is that forensic
21 evidence, targeted individual, you need confrontation.
22 THE COURT: I guess I'm stuck on the fact that
23 Justice Kagan, who's a lot smarter than I, doesn't think those
24 cases are so clear anymore in light of Williams, in light of
25 the plurality of Williams.

1    MR. LAISURE:  Well, she could be wrong, Judge.
2    THE COURT:  She's a reasonable jurist.
3    MR. LAISURE:  I understand that, but --
4    THE COURT:  The standard is whether a reasonable
5  jurist would agree.
6    MR. LAISURE:  Well, we can only look at what the
7  courts have said, you know, and what's out there.  And she may
8  have the impression that the next case from Williams is going
9  to go some different direction and that may be what she's
10 referring to.
11   But when you look at just the facts of Williams and
12 those two prior cases, I think the state of the law now is
13 very clear and that the fact that it's DNA doesn't change it
14 in any appreciable way.
15   Melendez-Diaz, by the way, said that neutral testing
16 to which Your Honor was referring before is -- that's been
17 rejected.  The Ohio-Roberts guarantee of trustworthiness thing
18 is gone.  And so it's really a question of being able to have
19 that constitutional right to challenge it the way you want to
20 challenge it, regardless of whether it seems trustworthy,
21 whether it probably is right.  None of that really matters.
22 And I don't see a difference between the facts of this case as
23 distinguished from Williams and those other two cases.
24   THE COURT:  What I'm thinking of doing here at the
25 very least is to certify this to the Circuit Court.  I think

1  that's indicated here so you have appealability, I guess,
2  right? And that's going to be the court that's going to
3  ultimately decide this case. I'm just sort of like a passing
4  station, I suspect, right?
5              MR. LAISURE: If that's the case, Judge, could I add
6  something that's not in our papers but -- well, the argument
7  part is not in our papers. It's in our Exhibit F that I
8  attached to the reply, and it goes to the people's argument
9  concerning whether the material is simply graphs and charts.
10             Bullcoming had a number of factors that it talked
11 about, whether the sample received was sealed, whether there
12 were specific tests done, whether there was no contamination,
13 whether there were identifying numbers that were accurate.
14 All of those appear in the underlying -- not the part that was
15 signed by Mr. Yanoff, but in the underlying graphs and charts.
16 There were statements made in there that go to each and every
17 one of the Bullcoming statements that they said were
18 testimonial and not just machine-generated stuff. So I wanted
19 to call Your Honor's attention to that.
20             THE COURT: So we can go on and on and on, but I
21 think I got a handle on it and I just wanted to give you folks
22 an opportunity to chat with me a little bit about these. I
23 think I identified the principal concerns that we have to
24 address here, right?
25             Is there anything else you would like to add?

1  MR. BRANIGAN: Your Honor, I don't have anything to
2  add except just that this is -- there is a lot of confusion in
3  the state of the law. It's very fluid. And, again, for
4  habeas purposes, I'd just add that there's no clear Supreme
5  Court precedent.
6  THE COURT: I understand. But this is sort of like
7  your preparation for your argument before the Second Circuit
8  and maybe the Supreme Court. Who knows, right? But I
9  appreciate the efforts you've made and we'll try to do the
10 best we can to at least explain what we're about here.
11 My instincts are that the law doesn't need that high
12 habeas standard. That's my instinct. And that I find it to
13 be kind of curious, because it may well be that if we didn't
14 have to grapple with the habeas standard, who knows what I
15 would have said, right? But I think I'm tending in that
16 direction under the constraints of the habeas statute.
17 Sometimes I don't like it, but I guess I took an oath to
18 follow the Supreme Court.
19 So probably I'm going to come out that way, but I'm
20 certainly going to address all of your concerns, hopefully, in
21 a fulsome way and try to get the latest word from our Circuit
22 authority so that when you go up to the Second Circuit you'll
23 have at least an updated version of where we're at today from
24 the desk of one judge. Okay?
25 So thanks very much. I enjoyed very much your

1  appearance and the work that you've done and I appreciate that
2  you sat so quietly and listened to all of this.  Would you
3  like to add anything?  Feel free to speak your piece.
4          MR. LAISURE:  I'd like to add one thing, my thanks
5  that you adjourned this due to the e-mail confusion that
6  originally I didn't know about the argument and you put this
7  off and that was great.  Thank you.
8          THE COURT:  I'm sorry, thanking me for what, just
9  having the oral argument?
10          MR. LAISURE:  For putting it off.  It was originally
11  scheduled for a different date.
12          THE COURT:  No, no, no, listen.  It's easy enough to
13  try to help lawyers.
14          MR. LAISURE:  Appreciate it.
15          THE COURT:  Thanks a lot.
16          MR. BRANIGAN:  Thank you, Your Honor.
17          (Whereupon, the proceedings were adjourned.)

16

1         I certify that the foregoing is a correct
2 transcript from the record of proceedings in the
3 above-entitled matter.
4
5            /s/   Sherry Bryant
           Sherry Bryant, RMR, CRR
6            Official Court Reporter